UNITED STATES of America

v.

David Keith HENSEL et al.

Crim. No. 80–00030 P.

United States District Court,
D. Maine.

March 20, 1981.

Thomas E. Delahanty, II, U. S. Atty., Margaret D. McGaughey, Asst. U. S. Atty., Portland, Me., for plaintiff United States of America.

John P. Ward, Michael Avery, Boston, Mass., for defendant David K. Hensel.

Jack H. Simmons, Lewiston, Me., for defendant Gerald W. Case.

Marshall A. Stern, Bangor, Me., for defendant Craig L. Dill.

Theodore K. Hoch, Bath, Me., for defendant John T. Downing.

Edward T. M. Garland, Atlanta, Ga., Joseph M. Hochadel, Portland, Me., for defendant Larry R. Duke.

Peter J. Rubin, Portland, Me., for defendant Robert C. Hubbard.

Peter J. DeTroy, III, Mark G. Lavoie, Portland, Me., for defendant William Storey.

David C. Pomeroy, Portland, Me., for defendant Charles T. Standley.

William P. Hardy, Lewiston, Me., Mark J. Kadish, Atlanta, Ga., for defendant John J. Wells.

## MEMORANDUM OF OPINION AND OR-DER ON DEFENDANT HENSEL'S MOTIONS TO SUPPRESS

GIGNOUX, Chief Judge.

Nine defendants are charged in a one-count indictment with conspiracy to possess with intent to distribute and to import into the United States approximately 18.7 tons of marijuana, in violation of 21 U.S.C. §§ 846 and 963. Presently before the Court are defendant Hensel's motions to suppress evidence and statements pursuant to Fed.R. Crim.P. 12(b)(3) and 41.[1] An evidentiary

---

1. Similar motions to suppress filed by the other eight defendants are the subject of a separate opinion.

hearing has been held, the issues have been comprehensively briefed and argued by counsel, and the following memorandum opinion contains the Court's findings of fact and conclusions of law as required by Fed. R.Crim.P. 12(e).

I

## THE FACTS

A. *The Pursuit, Boarding and Search of the PATRICIA—Arrest of Defendant Hensel*

At approximately 10:50 a. m. on May 31, 1980, the M/V PATRICIA, a 65-foot vessel, later determined to be of Honduran registry, was stopped by the Royal Canadian Mounted Police (RCMP) after a 24-hour high seas chase. On board were defendant David Keith Hensel, who is an American citizen, eight Colombian nationals, and 18.7 tons of marijuana.

The PATRICIA had first come to the attention of the United States Coast Guard (USCG) at approximately 10:30 a. m. on May 30 when the USCG Operations Center in Boston (CG Command) received a radio message from the J. BRADLEY O'HARA, a Rockland, Maine, fishing vessel, reporting a disabled vessel in the Gulf of Maine. On May 28, the crew on the O'HARA boat had first seen the PATRICIA in the Sewell Ridge area approximately 90 miles southeast of Rockland. The PATRICIA was not a familiar vessel in that area and did not appear to be fishing. On May 30, the PATRICIA approached the O'HARA boat and requested permission to use its radio. The captain, later identified as defendant Hensel, explained that his generator was not working, his radio batteries were dead, and he wished to contact a "partner" in the area with whom he planned to go to Canada to be rigged for fishing. Hensel was told that he could use the radio in half an hour, after the O'HARA's fishing nets were hauled back. During that half hour the captain of the O'HARA boat became suspicious and informed the USCG that the PATRICIA

was disabled. When the PATRICIA again drew alongside after the nets were hauled in, the O'HARA captain told Hensel he could not come aboard and informed Hensel that he had notified the Coast Guard. Hensel requested that the call be canceled and, upon learning that the Coast Guard was already on the way, gave the mate of the O'HARA boat three telephone numbers and asked him to call them. Instead of placing the calls, the captain of the O'HARA boat relayed them to the Coast Guard.

The CG Command dispatched a Coast Guard aircraft and the USCG Cutter RELIANCE to the scene with instructions to locate the disabled vessel in the Sewell Ridge area. The aircraft, piloted by Lt. Wayne Luginbuhl, arrived at Sewell Ridge at approximately 11:25 a. m. The PATRICIA was lying dead in the water. Lt. Luginbuhl's attempts to communicate with the PATRICIA by radio were unsuccessful. He made several low passes over the vessel and reported that it did not appear to be a fishing vessel, that the only identification was the name PATRICIA on the bridgewing, and that it was not flying the flag of any country. He requested a check of the El Paso Information Center (EPIC) computer. After the Coast Guard plane circled the PATRICIA several times, to Lt. Luginbuhl's surprise, the vessel got underway and proceeded in a northeasterly direction at five to ten knots per hour.

Shortly thereafter, the CG Command notified Lt. Luginbuhl that the EPIC check had revealed that a vessel named PATRICIA was suspected of drug smuggling.[2] He was directed to track the PATRICIA until the RELIANCE could reach her. Following standard operating procedure, Lt. Kent Morris of the CG Command then notified Special Agent Edward Drinan of the Drug Enforcement Administration (DEA) in Maine, and alerted the Canadian Coast Guard of the possibility the PATRICIA was heading for Nova Scotia.

2. It was learned afterward that the EPIC report related to another vessel of similar description, also named PATRICIA, and not to the vessel in Sewell Ridge on May 30.

Lt. Luginbuhl maintained surveillance as the PATRICIA headed generally northeast toward Nova Scotia. He attempted, without success, to communicate with the vessel by radio and by smoke float. Finally, he dropped a message block ordering the vessel to reverse course for rendezvous with the RELIANCE.[3] At the request of the CG Command, the Canadian Coast Guard dispatched to the scene a Buffalo aircraft, which relieved Lt. Luginbuhl at approximately 3:00 p. m. The Canadian plane also attempted to communicate with the PATRICIA by dropping a second message block, which was not retrieved, and then tried unsuccessfully to divert the vessel's course with smoke floats. The PATRICIA continued its way toward Nova Scotia at a speed of eight knots. At approximately 7:00 p. m., another USCG plane relieved the Canadian Buffalo. Efforts to communicate with the PATRICIA and to divert it from its course were again unsuccessful.

In the meantime, the Canadian Coast Guard had contacted the Canadian Department of Fisheries to arrange for the use of two vessels, should they be needed, and Cpl. Robert Janes of the RCMP Halifax Drug Section was apprised of the possibility that the PATRICIA was headed toward Nova Scotia, with contraband on board. Direct communication between Cpl. Janes and Lt. Morris was established and maintained throughout the night of May 30 and the early morning hours of May 31.

By 7:00 p. m. it became evident that the PATRICIA's course and speed would bring it into Canadian waters before the RELIANCE could intercept it. Its destination appeared to be the southern tip of Nova Scotia. Consequently, Cpl. Janes contacted S/Sgt. Brogan of the RCMP Yarmouth detachment to set up a communication network in Yarmouth. Sgt. Brogan set up RCMP surveillance at 50-mile intervals along the Nova Scotia coast, at Liverpool, Barrington and Shelburne, and prepared to relay information from the Canadian Coast Guard and Fisheries Department to the surveilling agents. Cpl. Janes also advised Lt. Morris of the RCMP's intent to stop and board the PATRICIA if it came within 21 miles of the Canadian shore. At approximately 8:00 p. m., S/Sgt. Brogan dispatched the Canadian Fisheries vessel LOUISBOURG from Yarmouth to intercept the PATRICIA. Five RCMP agents accompanied the crew.

Lt. Morris was also in communication with DEA Agent Drinan during the night of May 30–31. DEA investigation and an EPIC check had revealed that two of the telephone numbers the PATRICIA had asked the O'HARA mate to call were for exchanges in Florida listed under the names of Timothy Carey and Harvey Watkins, both of whom were suspected of conspiring to import marijuana into South Carolina in a vessel named HUH?.[4] The third telephone number was for an exchange in Cobbtown, Georgia, but the identity of the subscriber could not be identified at that time.[5] When this information was passed on to Drinan, he informed Lt. Morris that the DEA was maintaining surveillance of a suspected marijuana offloading site on the Maine coast and that vehicles seen at the site were from Florida and Georgia. Drinan asked that he be kept informed of any information the Coast Guard obtained regarding the PATRICIA. At various points during the night Drinan was also in communication with Cpl. Janes and S/Sgt. Brogan of the RCMP, whom he had informed of DEA's Maine investigation. Drinan encouraged the Canadians to seize the PATRICIA if the vessel entered Canadian waters.

---

**3.** The dropped message read:

As a stateless vessel you are in possible violation of United States laws and we as Federal Law Enforcement agents order you to reverse your heading to 253 ° magnetic for rondevous [*sic*] and boarding by Coast Guard Cutter Reliance.

Per order of Commander
First Coast Guard District

**4.** A coconspirator in that investigation had been one Wayne Dennis Hensel, who was later determined to be the brother of defendant Hensel.

**5.** It was subsequently learned that several digits in the Georgia telephone number had been transposed.

Meanwhile, USCG aircraft continued surveillance of the PATRICIA. They dropped other smoke bombs without success and observed that the PATRICIA was operating without navigational lights. At one point during the evening, one of the pilots plotted the PATRICIA at 13.5 miles from the Nova Scotia coast. Other plottings showed the PATRICIA to be steering an erratic course which was within the 21-mile Canadian limit for substantial periods of time.

The LOUISBOURG made radar contact with the PATRICIA at approximately 3:00 a. m. and visually sighted the vessel at 5:11 a. m. The RELIANCE arrived on the scene at 6:00 a. m. Both vessels attempted to communicate with the PATRICIA by radio, flag hoists, flashing lights and loud hailer. The PATRICIA did not respond and headed further east into the Atlantic Ocean. The operations officer on the RELIANCE, Lt. Dennis Schenk, reported that the PATRICIA was badly rusted and was riding below the waterline. No nets or fishing gear were seen above the deck. The name PATRICIA appeared on the bridgewing, but no home port was displayed, and no identifying numbers were visible on the hull. The deck was poorly maintained with tire marks appearing on the starboard side. Two black crew members were seen on deck, and substantial electronic and radar equipment and antennas could be seen in or on the pilothouse. Lt. Schenk also noted that the PATRICIA had raised and was flying an Honduran flag.

When the Honduran flag was observed, the RELIANCE, upon instructions from the CG Command, informed the LOUISBOURG that, pursuant to the Coast Guard Commandant's Instruction 16244.1, the Americans could not board the PATRICIA without first obtaining permission from the United States Department of State and the Honduran government, via a statement of "no objection" from the Commandant. The RELIANCE informed the Canadians that it would take 24 to 48 hours to obtain such permission. This, and other information about the PATRICIA, was relayed to DEA Agent Drinan, and at 8:51 a. m. the RELIANCE received a "for information only" teletype from the CG Command advising that DEA agents were surveilling a suspected marijuana offloading site at Turkey Cove, Tenant's Harbor, Maine; that they were prepared to close in and arrest those on the property; and that they were interested in ascertaining the identities of those on board the PATRICIA as soon as possible. The Canadians had also been apprised of the DEA's interest in the vessel.

The RELIANCE passed the information regarding the surveillance in Maine on to the LOUISBOURG, but informed the Canadians that the RELIANCE could not take action to stop and board the PATRICIA until permission was obtained from the Honduran government. Cpl. Janes, upon hearing that the RELIANCE would have to wait 24 hours or more before permission to board could be obtained, consulted his superior and was instructed that if the PATRICIA was then or had been within Canada's 21-mile limit, the Canadians should board the vessel for suspected violation of Canadian customs laws.

At 9:01 a. m., the LOUISBOURG informed the RELIANCE that if the RELIANCE were not going to take action, the LOUISBOURG would. At 9:40 a. m., the LOUISBOURG reported that it had received permission to board the PATRICIA, but if circumstances became dangerous, it was to cancel the boarding. The Canadians sought permission to land a helicopter on board the RELIANCE if it was necessary to bring reinforcements, and asked the RELIANCE to show its fire power. The RELIANCE agreed, displaying a manned three-inch gun at the bow, and stated that it would stand by, and, if need be, would protect the LOUISBOURG in accordance with the Coast Guard's "use of force" policy.

The LOUISBOURG circled the PATRICIA at high speed in an attempt to stop her with its wake action. When this method failed, the RCMP officers displayed 12-gauge shotguns and fired a warning shot across the PATRICIA's bow. Two more shots were fired into the wheelhouse, and at

9:50 a. m. the PATRICIA came to a halt, approximately 65 miles off the southeast coast of Nova Scotia.

An armed party of RCMP, led by Cpl. Donald McRae, boarded the PATRICIA. The RCMP ordered the crew of eight Colombians and one American to the stern of the boat. Cpl. McRae went to the wheelhouse, where he discovered documents indicating that in 1976 the PATRICIA had been registered in Honduras to a Colombian national. Charts and navigational aids were also found lying about in the wheelhouse. In the first cabin behind the wheelhouse on the port side, later determined to be occupied by Hensel, radios and other communications equipment were visible through the door, which was bolted open. After loosening the bolts on two closed hatches on the bow, Cpl. McRae discovered over 600 burlap bags containing a total of 18.7 tons of marijuana. Hensel and the Colombians were then placed under arrest for importation of a narcotic, and read the "primary warning" which is routinely given by Canadian law enforcement agents to criminal suspects, as follows:

> You need not say anything. You have nothing to hope from any promise or favor, and nothing to fear from any threat, whether or not you say anything, and anything you do say may be used as evidence.

Approximately one-half hour later, when the PATRICIA and its crew were completely under RCMP control, Cpl. McRae radioed the LOUISBOURG to request that the RELIANCE send over Spanish speaking interpreters, if available, to interview the eight Colombians, who spoke no English. The RELIANCE responded by dispatching two interpreters. Lt. Schenk also boarded the PATRICIA to obtain information on the documentation and equipment on the vessel and to ascertain for transmittal to the DEA the identities of those arrested. Lt. Schenk stayed on board about an hour. He examined documents, charts and electronic equipment in the pilothouse and in Hensel's cabin, and obtained the names, addresses and dates of birth of the crew. Neither Lt. Schenk nor the RCMP seized any evidence from the PATRICIA at this time.

After the Americans had returned to the RELIANCE, the Canadians secured the PATRICIA for towing to a Canadian Fisheries' facility in Shelburne, Nova Scotia.

#### B. *The Interrogation of Defendant Hensel*

RCMP Cst. William Parker stayed with Hensel during the trip to Shelburne. During that time, Hensel provided Parker with pedigree information such as his address, which he claimed was in Connecticut. Hensel stated that he did not know who the owner of the PATRICIA was. Other than saying that the vessel was headed to Africa, he would not discuss the subject of the PATRICIA's cargo, or of the voyage. The LOUISBOURG, with the PATRICIA in tow, arrived in Shelburne at about 8:00 p. m. The marijuana bales, radio equipment and documents were unloaded from the vessel and secured in RCMP storage facilities.

Hensel was taken to a nearby motel, where he was provided dinner and a shower. Cst. Parker and another RCMP officer accompanied Hensel to his room, and again gave him the police caution which he had been given on board the PATRICIA. Hensel indicated he understood it. He then admitted that Connecticut was not his proper address, and that his true residence was Key West, Florida. At one point he stated that he wanted a lawyer and was given the yellow pages of a telephone book to look for one. The subject was dropped. The conversation lasted about one hour.

At 11:00 a. m. the next morning, June 1, Hensel was taken to the Shelburne RCMP headquarters for booking. During the morning, RCMP Cst. Gary Grant and another Canadian official searched the Nova Scotia coastline, from Shelburne to Liverpool, by helicopter in search of any offloading site. A search of two hours did not reveal such a site.

At 1:00 p. m., Hensel was interviewed at RCMP headquarters by Csts. Grant and Wayne Noonan. Before any questions were asked, the agents recited the standard RCMP "secondary warning on purged statement," as follows:

I wish to give you the following warning. You must clearly understand that anything said to you previously should not influence you or make you feel compelled to say anything at this time. Whatever you felt influenced or compelled you to say earlier, you are not now obligated to say anything further, but whatever you do say will be taken down in writing and may be given in evidence. You understand what had been said to you?

Hensel indicated he understood.

Initially, questioning focused on Hensel's background, his father's suicide, his girlfriend, his knowledge of boating and the sea. At 2:00 p. m. Hensel asked how he could contact an attorney. He was advised that "you are not in the United States now, son" and that at that time an attorney would not be supplied.

Grant and Noonan employed a "good guy-bad guy" technique for interrogation. Grant expressed sympathy for the defendant, while Noonan indicated that he did not care what happened to defendant and pointed out that there was a seven-year mandatory penalty in Canada for smuggling drugs. The interview ended at 4:45 p. m.

Shortly thereafter, Hensel indicated he wished to talk to Cst. Parker. At 6:00 p. m., Parker and another RCMP officer brought Hensel a supper of chicken and french fried potatoes. He drank three beers with the meal. Sometime thereafter Hensel stated that he had been at sea for 21 days and the food supply was nearly gone; that during the pursuit the Colombian crew wanted to stop and leave the vessel; that the vessel "HUH?", which he claimed to own, was seized in South Carolina, and his brother had been involved; that the contents of the PATRICIA had not been destined for Canada but for "the States"; and that he was to have been paid $400,000 for the delivery, the crew members to receive 3500 pesos each.

6. The eight Colombians were deported to Colombia.

The results of this discussion were passed on to Cpl. Janes and to DEA Agent Drinan in Portland. Hensel then asked if he could use the telephone. In the officers' presence, he called one Howie Fuguary in Florida, told him where he was, and requested assistance. He also asked Fuguary to telephone a person named Judy to let her know where he was.

The following day, June 2, Hensel was transported from Shelburne to Halifax. Because the PATRICIA had not been seen within 12 miles of the Nova Scotia coast, the Canadian officials concluded that jurisdiction to prosecute Hensel under Canadian law could not be established. He was therefore informed by the RCMP that no charges were to be prosecuted against him in Canada.

On June 3, at an informal immigration hearing at which Hensel was represented by counsel, Hensel waived any challenge to expulsion from Canada and was put on board a nonstop flight to Boston, accompanied by two RCMP officers.[6]

Drinan was waiting at Logan Airport in East Boston when the airplane arrived on the afternoon of June 3. After the RCMP agents identified Hensel, Drinan asked Hensel if he would accompany him to his office in Portland for a discussion with the United States Attorney. He informed Hensel that he need not agree to the request. Hensel asked what would happen if he refused. Drinan responded that he was not sure. Hensel then asked permission to call his attorney.

At a nearby Customs office, and in Drinan's presence, Hensel telephoned an attorney in Boston to inform him of Drinan's request and to ask for his advice. He also instructed the attorney to telephone a woman attorney in Pennsylvania, "who would know who to call and know what to do." Hensel then handed the telephone to Drinan. After a conversation with the attorney, and at his suggestion, Drinan placed Hensel under arrest. He then informed Hensel of his *Miranda* rights. A short time later, Hensel was brought before a United

States magistrate in Boston and charged with conspiracy to import marijuana.

## II

### THE LAW

Defendant Hensel seeks to suppress all evidence seized by the Canadian authorities from the PATRICIA, together with the fruits of said search and any reference to such evidence, on the ground that the boarding and search of the PATRICIA violated his Fourth Amendment rights. In addition, defendant seeks suppression of the statements and admissions made by him while in Canadian custody, because obtained in violation of his Fifth Amendment rights. The Court will treat separately each of these contentions.

### A. *The Boarding and Search of the PATRICIA*

Defendant contends that the Canadian authorities boarded and searched the PATRICIA "at the request or instruction and with the knowledge and/or participation of" the United States Coast Guard; that the Fourth Amendment to the United States Constitution is therefore applicable; and that the boarding and search violated defendant's Fourth Amendment rights because made without legal authority and not based on either reasonable suspicion or probable cause. The government argues that the defendant is foreclosed from challenging the validity of the boarding and search of the PATRICIA because he had no reasonable expectation of privacy in the vessel or its cargo; that the Canadian officers who boarded and searched the PATRICIA were acting independently of the United States Coast Guard and therefore the Fourth Amendment does not apply; and that, in any event, defendant's Fourth Amendment rights were not violated because the boarding and search were supported by adequate legal authority and justified both by reasonable suspicion and by probable cause.

Although defendant probably had no reasonable expectation of privacy in the PATRICIA or its cargo, the Court assumes for the purpose of this opinion that he may raise a Fourth Amendment challenge to the boarding and search of the vessel. The Court also concludes that the participation of the United States Coast Guard in the seizure and search was sufficiently substantial so that the Fourth Amendment is applicable. The Court holds, however, that the boarding and search of the PATRICIA were supported by adequate legal authority and justified both by reasonable suspicion and by probable cause, and therefore did not violate any Fourth Amendment rights defendant may have had.

### 1. *The Defendant's Standing*

[1] In order to contest a search or seizure on Fourth Amendment grounds, a defendant has the burden of establishing that he had a legitimate and reasonable expectation of privacy in the premises searched or the property seized. *Rawlings v. Kentucky,* 448 U.S. 98, 104–105, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633 (1980); *Rakas v. Illinois,* 439 U.S. 128, 130, 131 n.1, 148–49, 99 S.Ct. 421, 423 n.1, 433, 58 L.Ed.2d 387 (1978). By his own admission, defendant did not own the PATRICIA or the marijuana seized from the vessel's hold. Nor did defendant claim that he had any property interest in the communications equipment, charts or documents discovered in the wheelhouse or in his cabin. Because vessels on the seas are commonly subject to stops by Coast Guard and Customs officers for a variety of document and safety inspections, the government persuasively argues that defendant could have had little, if any, expectation of privacy in those parts of the PATRICIA, such as the wheelhouse, the holds and Hensel's exposed cabin, that would be in the plain view of one conducting such an inspection. There is substantial merit in this argument. *See United States v. Williams,* 617 F.2d 1063, 1075, 1084 (5th Cir. 1980) (en banc);[7] *United States v. Arra,* 630 F.2d

---

**7.** Although the en banc *Williams* court felt that the record in that case was insufficient to determine whether the defendant had some property interest in the vessel or the marijuana

836, 841 n.6 (1st Cir. 1980). But since the Court concludes, *post*, that the search and seizure were valid, for the purposes of this opinion the Court will assume that defendant has standing to raise his present Fourth Amendment attack.

2. *The Applicability of the Fourth Amendment*

 The Fourth Amendment exclusionary rule does not apply to arrests and searches made by foreign authorities on their home territory and in the enforcement of foreign law even if the persons arrested and from whom the evidence is seized are American citizens. *United States v. Rose*, 570 F.2d 1358, 1361–62 (9th Cir. 1978); *United States v. Marzano*, 537 F.2d 257, 269–71 (7th Cir. 1976); *United States v. Morrow*, 537 F.2d 120 (5th Cir. 1976); *Stonehill v. United States*, 405 F.2d 738 (9th Cir. 1968), *cert. denied*, 395 U.S. 960, 89 S.Ct. 2102, 23 L.Ed.2d 747 (1969); *Birdsell v. United States*, 346 F.2d 775, 782–83 (5th Cir.), *cert. denied*, 382 U.S. 963, 86 S.Ct. 449, 15 L.Ed.2d 366 (1965). To this general rule there are two exceptions. First, if the circumstances of the foreign search and seizure are so egregious that they "shock the judicial conscience," exclusion of the evidence may be required. *See, e. g., United States v. Toscanino*, 500 F.2d 267, 276 (2d Cir. 1974) (physical torture). No such extreme conduct is alleged here.[8]

"Second, if American law enforcement officials participated in the foreign search, or if the foreign authorities actually conducting the search were acting as agents for their American counterparts, the exclusionary rule can be invoked." *United States v. Morrow, supra* at 139; *United States v. Rose, supra* at 1362. The particular facts in each case must be examined to determine whether the American officials so substantially participated in the search and seizure as to convert it into a joint venture between the United States and the foreign officials, thereby triggering application of the Fourth Amendment. *United States v. Rose, supra; United States v. Morrow, supra; Stonehill v. United States, supra* at 743. *Cf. Lustig v. United States*, 338 U.S. 74, 69 S.Ct. 1372, 93 L.Ed. 1819 (1949); *Byars v. United States*, 273 U.S. 28, 47 S.Ct. 248, 71 L.Ed. 520 (1927).

 Although the question is close, the Court is persuaded that the extent of the cooperation between the United States Coast Guard and the Canadian officials in the pursuit, boarding and search of the PATRICIA requires the conclusion that a joint venture existed compelling application of the Fourth Amendment. The surveillance which led to the stop of the PATRICIA was initiated by the United States Coast Guard. It was at the request of the Americans that the Canadians became involved in the pursuit. DEA Agent Drinan urged the Canadians to board if the vessel entered Canadian waters. When it became apparent that the RELIANCE could not board the PATRICIA until the consent of the Honduran government was obtained, the RELIANCE agreed to support a boarding by the LOUISBOURG by displaying its fire power and providing backup assistance if required. The RELIANCE dispatched two interpreters to the PATRICIA to help the Canadians question the Spanish speaking crew. Lt. Schenk also went aboard the PATRICIA. He accompanied Canadian officers in a second search of the vessel; examined documents, electronics equipment and charts; and obtained the identities of the crew for submission to DEA Agent Drinan in Maine.

Clearly, this is not a case in which United States law enforcement officers were passively present at the scene of a search and seizure, *see United States v. Marzano, supra* at 270; not a situation in which United States officers merely furnished information to foreign officials, *see id.; United States v. Morrow, supra* at 140; and not an

---

seized, it agreed with the panel's holding that a mere crew member could have no privacy interest in the holds of a cargo vessel. 617 F.2d at 1084.

8. Defendant does not claim, nor could he, that the use of weapons to effectuate the stop constituted excessive force. *See United States v. Arra, supra* at 845 n.11.

instance in which United States officers were aware of and shared the fruits of a contested foreign search, but took no part in the actual operation, *see Stonehill v. United States, supra* at 746. In the instant case, the record discloses that the United States Coast Guard instigated, coordinated and closely collaborated with the Canadians in effectuating the seizure and search of the PATRICIA. In short, the participation of the Americans was sufficiently substantial to permit defendant to invoke the protection of the Fourth Amendment. *Cf. Lustig v. United States, supra; Byars v. United States, supra.*

### 3. The Constitutionality of the Boarding and Search

In determining whether the boarding and search of the PATRICIA violated defendant's Fourth Amendment rights, the Court employs the analysis developed by the Supreme Court in *United States v. Ramsey*, 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977), and subsequently utilized by the en banc Fifth Circuit in *United States v. Williams, supra.*[9] The Court first inquires whether the Coast Guard had statutory authority to seize and search the PATRICIA. The Court then considers whether the seizure and search, although authorized, violated the Fourth Amendment.

(a) *Statutory Authority.* Section 89(a) of Title 14, U.S.C.A., authorizes the Coast Guard to

> make inquiries, examinations, inspections, searches, seizures, and arrests upon the high seas and waters over which the United States has jurisdiction, for the prevention, detection, and suppression of violations of laws of the United States. For such purposes, commissioned, warrant, and petty officers may at any time go on board of any vessel subject to the jurisdiction, or to the operation of any law, of the United States, address inquiries to those on board, examine the ship's documents and papers, and examine, inspect, and search the vessel and use all necessary force to compel compliance.

14 U.S.C.A. § 89(a).

In *United States v. Williams, supra,* recently decided by the Fifth Circuit, the court held that Section 89(a) authorizes the Coast Guard to seize and search a foreign vessel in international waters if the Coast Guard first has a reasonable suspicion that those aboard the vessel are engaged in a conspiracy to smuggle contraband into the United States and that there is contraband in the hold of the vessel. In *United States v. Hilton*, 619 F.2d 127, 131 (1st Cir. 1980), the Court of Appeals for this Circuit indicated that the Coast Guard could not constitutionally conduct a search more extensive than a document and safety inspection except by consent or where probable cause existed. The *Hilton* opinion was issued, however, before the en banc opinion in *Williams,* and the First Circuit has not yet decided whether to adopt the Fifth Circuit's view that probable cause is not required for a Coast Guard boarding and search of a vessel on the high seas in situations which do not fall within the document and safety rationale. *See United States v. Arra,*

---

**9.** In assessing the validity of a Coast Guard search of a foreign vessel on the high seas, the *Williams* court explained the *Ramsey* two-part analysis as follows:

> The two-part structure of the Supreme Court's analysis in *Ramsey* implies that a warrantless seizure or search in the complete absence of authority—a lawless governmental intrusion—is unconstitutional per se. If it were possible for an *unauthorized* seizure or search to be reasonable in a fourth amendment sense, then the presence or absence of authority would be merely a factor to be considered by the court in assessing reasona-

bleness; instead, *Ramsey* poses the issue of authority as a threshold determination. In other words, if the Government can point to no authority for a challenged search or seizure, a court must conclude, without any further consideration, that the search or seizure was unconstitutional. On the other hand, if it can be established that the search or seizure was authorized, the court must then determine whether the search or seizure, as authorized, was reasonable within the meaning of the fourth amendment.

617 F.2d at 1074.

*supra* at 842 n.8. It is not necessary for this Court to anticipate whether the First Circuit will adopt the Fifth Circuit's *Williams* formulation, as the record in the present case more than adequately supports the conclusion that the Coast Guard had probable cause to believe that those aboard the PATRICIA were engaged in a conspiracy to smuggle contraband into the United States and that there was contraband aboard the vessel.[10]

For several days the crew of the O'HARA boat had seen the PATRICIA lying idly with no apparent purpose in the Gulf of Maine just outside United States waters, with one white man and several black men on board. An EPIC check disclosed that two of the land line telephone numbers which the white man requested the O'HARA captain to call were listed to suspected drug smugglers and suggested a possible connection between the PATRICIA and a suspected drug offloading site in Maine. An EPIC check further revealed that a vessel named PATRICIA was suspected of drug smuggling. The PATRICIA had no fishing gear or nets on deck, yet sat low in the water. The only identification was the name PATRICIA on the bridgewing. The vessel did not fly the flag of any country until approached by the LOUIS-BOURG and the RELIANCE, at which time it raised an Honduran flag. The PATRICIA carried sophisticated electronic and radar equipment. When the first Coast Guard plane arrived, the vessel got underway and fled, although the white man had reported to the O'HARA boat that she was disabled and in need of assistance. During the ensuing pursuit, the PATRICIA continuously refused to identify herself, to stop, or to deviate from her northeasterly course, despite repeated attempts by the Coast Guard to communicate with the vessel by radio, message block, smoke floats, flag hoists and loud hailer. During the entire night the PATRICIA was under observation, the vessel was operating without navigational lights, steering an erratic course toward the open sea. Only after the RCMP aboard the LOUISBOURG opened gunfire did the PATRICIA finally come to a stop. These facts add up to ample probable cause for the Coast Guard to believe that the PATRICIA was engaged in a conspiracy to smuggle contraband into the United States. The seizure and search of the vessel were therefore authorized by Section 89(a).[11]

(b) *Constitutionality.* The Court has held that the Coast Guard undoubtedly had not only reasonable suspicion but probable cause to believe that the PATRICIA was engaged in a conspiracy to smuggle contraband into the United States. Whether or not the First Circuit adheres to the suggestion in *Hilton* that the Coast Guard cannot constitutionally conduct a nonconsensual search, other than a document and safety inspection, except upon probable cause, or decides to adopt the Fifth Circuit view which would permit such a search upon a reasonable suspicion standard, the existence of probable cause in the present case unquestionably satisfies the Fourth Amendment requirement

---

10. The Court rejects defendant's contention that since it was the Canadian officials who actually stopped, boarded and first searched the PATRICIA, Section 89(a) cannot be invoked to authorize their actions. The Court has found that the Canadians and the Americans were engaged in a joint venture in the boarding and search of the vessel. Implicit in the holding that the participation of the United States Coast Guard was sufficient to trigger application of the Fourth Amendment, is the conclusion that the Canadians were acting "under the aegis of" the Americans. In such circumstances, there was no improper delegation of the authority conferred upon the Coast Guard by Section 89(a). *See United States v. Warren*, 578 F.2d 1058, 1067 (5th Cir. 1978), *rev'd on other grounds*, 612 F.2d 887; *United States v. Bates*, 526 F.2d 966, 967 (5th Cir. 1976).

11. Because the Court concludes that Section 89(a) authorized the seizure and search, the Court need not consider whether, as the government urges, the stop was authorized by the Canadian Customs Act, R.S.C.1970, c. 40 § 1 *et seq.*, or under the international common law doctrine of "right to approach," codified in Article 22 of the Convention on the High Seas, 13 U.S.T. 2312, T.I.A.S. No. 5200.

of "reasonableness." *See United States v. Williams, supra. See also United States v. Hilton, supra; United States v. Arra, supra.*[12] The seizure and search of the PATRICIA did not violate any Fourth Amendment rights defendant may have had.

### B. *The Interrogation of Defendant Hensel*

Defendant Hensel contends that the statements made by him while in Canadian custody were obtained in violation of his Fifth Amendment rights because he was not given the warnings required by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1956), and because his statements were not voluntary. The Court disagrees.

■ Where American officers actively participated in the arrest and interrogation of a defendant by foreign officials, *Miranda* warnings must be administered prior to questioning. *United States v. Emery,* 591 F.2d 1266, 1267–68 (9th Cir. 1978). Where, however, United States agents do not actively participate in the arrest and interrogation, the failure to give *Miranda* warnings does not invoke the Fifth Amendment exclusionary rule. *United States v. Trenary,* 473 F.2d 680, 681 (9th Cir. 1973); *United States v. Chavarria,* 443 F.2d 905 (9th Cir. 1971); *United States v. Nagelberg,* 434 F.2d 585, 587 n.1 (2d Cir.), *cert. denied,* 401 U.S. 939, 91 S.Ct. 935, 28 L.Ed.2d 219 (1971). *See also Pfeifer v. United States Bureau of Prisons,* 615 F.2d 873, 877 (9th Cir. 1980). In such circumstances, the rationale for excluding statements made by a defendant is not present. As the Ninth Circuit pointed out in *United States v. Chavarria, supra* at 905,

> *Miranda* was intended as a deterrent to unlawful police interrogations. When the interrogation is by the authorities of a foreign jurisdiction, the exclusionary rule has little or no effect upon the con-

duct of foreign police. Therefore, so long as the trustworthiness of the confession satisfies legal standards, the fact that the defendant was not given *Miranda* warnings before questioning by foreign police will not, by itself, render his confession inadmissible.

In the present case, no American agent was present or in any way participated in the questioning of defendant by the Canadian officers. Nor is there any suggestion that the Americans arranged for the Canadians to interrogate defendant in order to circumvent the requirements of the United States Constitution. Therefore, no purpose would be served by requiring the Canadian police to comply with *Miranda,* and the failure of the RCMP to give defendant *Miranda* warnings does not render his statements inadmissible.

■ The Court also rejects defendant's contention that the statements he made to the Canadian agents were involuntarily made. The RCMP read to defendant the warnings required under Canadian law before each of his three interviews. Defendant was 30 years old at the time of his questioning, and a high school graduate. He suffered from no physical or mental disabilities. The testimony of the Canadian officers, which the Court accepts, is that he remained rational and composed throughout the interviews. The officers also flatly contradict defendant's testimony that he was subjected to threats and that he was under the influence of alcohol. Although defendant drank several beers before making his last statements to Cst. Parker, the consumption of alcohol does not require a finding that he lacked the capacity to think clearly and rationally. *See United States v. Holmes,* 632 F.2d 167, 168–69 (1st Cir. 1980). In short, the government has carried its burden of establishing by a preponderance of the evidence that defendant's statements were "the product of a rational intellect and a free will," *Townsend v. Sain,* 372 U.S. 293,

---

12. As the Fifth Circuit observed in *Williams,* it follows from its conclusion that the existence of reasonable suspicion satisfied the requirements of the Fourth Amendment that the warrant requirement of the Fourth Amendment does not apply to maritime searches and seizures. *United States v. Williams, supra* at 1075. *See United States v. Arra, supra* at 842 n.7.

307, 83 S.Ct. 745, 754, 9 L.Ed.2d 770 (1963), and that they were therefore voluntary. *Lego v. Twomey,* 404 U.S. 477, 482–87, 92 S.Ct. 619, 623, 30 L.Ed.2d 618 (1972); *United States v. Holmes, supra.*

### III

### ORDER

Defendant Hensel's motions to suppress evidence and statements are in all respects DENIED.

IT IS SO ORDERED.