NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11524


COMMONWEALTH  vs.  KRISTOPHER GRIFFIN.



Bristol.     April 8, 2016. - November 4, 2016.

Present:  Gants, C.J., Spina, Botsford, Duffly, & Hines, JJ.[1]


Homicide.  Home Invasion.  Insanity.  Mental Health.  Evidence,
    Sanity.  Practice, Criminal, Capital case, Assistance of
    counsel, Opening statement, Argument by prosecutor,
    Instructions to jury.




Indictments found and returned in the Superior Court
Department on September 28, 2009.

The cases were tried before E. Susan Garsh, J.


Neil L. Fishman for the defendant.
Yul-mi Cho, Assistant District Attorney, for the
Commonwealth.


GANTS, C.J.  In the late evening or early morning of July

23 and 24, 2009, the defendant broke into the house where his

six year old daughter lived with the defendant's former girl

friend and slit his daughter's throat, causing her death.  A

_____

[1] Justices Spina and Duffly participated in the deliberation
on this case prior to their retirements.

Superior Court jury convicted the defendant of murder in the first degree on the theories of deliberate premeditation and extreme atrocity or cruelty, in violation of G. L. c. 265, § 1, and of home invasion, in violation of G. L. c. 265, § 18C.[2]  At trial, the defendant did not contest that he had killed the victim, but pursued a defense that he was not criminally responsible at the time of the killing.

The defendant presents four claims on appeal.  First, he contends that the evidence at trial was insufficient as a matter of law to permit a rational jury to find beyond a reasonable doubt that he was criminally responsible at the time of the killing.  Second, he claims that his trial counsel provided ineffective assistance of counsel by admitting in his opening statement that the defendant's conduct was "not psychotic."  Third, he contends that the prosecutors made improper remarks during their opening statement and closing argument.  Fourth, he argues that the judge's instruction regarding the consequences of a verdict of not guilty by reason of lack of criminal responsibility created a substantial likelihood of a miscarriage of justice.  We affirm the defendant's convictions, and having reviewed the entire record of the case pursuant to our duty

---

[2] On the conviction of murder in the first degree, the defendant was sentenced to life imprisonment without the possibility of parole.  On the conviction of home invasion, the defendant was sentenced to a concurrent term of life imprisonment.

under G. L. c. 278, § 33E, we find no reason to exercise our authority to order a new trial or to reduce the verdict of murder in the first degree.

Background. Because the defendant challenges the sufficiency of the evidence, we recount the evidence in the light most favorable to the Commonwealth. In July, 2003, Deborah Mons gave birth to the victim; the defendant was the victim's biological father. The defendant and Mons had begun to date in 2002, and in July or August of that year the defendant moved into Mons's home, where she lived with her three sons from previous relationships. From 2003 to the spring of 2006, the defendant continued to live with Mons in her house for "most of the time," but their relationship was turbulent. In January, 2003, after the defendant made a trip to Florida and visited with an ex-wife, Mons told the defendant that he could not be in a relationship with both her and his ex-wife. When Mons gave the defendant this ultimatum, the defendant appeared depressed and asked to be taken to the hospital. He was treated at the hospital for three to five days, and did not live at Mons's house from February to July of 2003.

In 2006, Mons broke off the relationship because it "just wasn't working out," and she asked the defendant to move out. However, between 2006 and 2009, Mons and the defendant occasionally dated, albeit "[n]othing on a regular basis," and

the defendant would occasionally stay at Mons's house when he needed a place to stay.  Each time the defendant moved back into the house, he would stay until Mons told him that he needed to leave.

In January, 2008, the victim, then four, made "a sexually inappropriate statement" that appeared to implicate one of Mons's sons, who was thirteen at the time.  As a result of that statement, the son was sent to a hospital for a psychiatric evaluation and was later placed in a residential treatment facility.

In the spring of 2009, Mons began a relationship with a man named Anthony,[3] who lived in North Carolina.  In June, Mons spent a week in North Carolina with him.  At this time, Mons told the defendant that she was planning to move to North Carolina and take the victim with her, but before she could move she needed to arrange for her son to be placed in a treatment facility in North Carolina, which she anticipated would take at least another year.

The defendant began staying at Mons's house again early in June, 2009.  While he was living there, the defendant learned that Mons was in a sexual relationship with both him and Anthony.  Thereafter, the defendant logged on to a social networking account used by Mons, read exchanges between her and

---

[3] The record does not identify Anthony's last name.

Anthony, and deleted her social networking profile. Around the same time, the defendant told Mons that he would "go to the facility [her son] was at and take [the son] out and then take himself out" in order to make her move to North Carolina easier. Because of that statement, Mons asked the defendant to move out of her home, which he did on July 9.

Mons said the defendant was not "happy" about having to move out, and did not know where he was going to stay. On July 10, Mons returned a missed telephone call from the defendant and heard his outgoing voicemail message, in which he said that he "had lost his battle with mental illness and was no longer available." A few hours after hearing that message, the defendant arrived at Mons's house to retrieve some belongings. Mons called the police and spoke to the defendant when the police arrived. The defendant stated that he was "just upset" and "did not really mean what he had said in the voicemail." He agreed to be voluntarily taken by the police to a hospital for a psychiatric evaluation. The hospital determined that he was not suicidal and released him the following day.

After his release, on July 11, the defendant asked a friend, Robert Fisher, if the defendant could stay in a camper that Fisher had on his property. Fisher and his wife allowed the defendant to stay in the camper for two weeks. During the next twelve days, the defendant lived in the camper and assisted

with the care of Fisher's father, who lived with Fisher and had Alzheimer's disease.  Fisher did not notice anything unusual about the defendant's behavior during this period.

On July 23, the defendant called Mons's house at 7:30 P.M. to speak to the victim, as he did many nights.  Mons told him that the victim was already in bed and that, if he wanted to talk to the victim over the weekend, he should call Mons's cellular telephone as she was taking the victim on a trip to Washington, D.C., or North Carolina that weekend.  The defendant was upset and told Mons that she could not "take [the victim] away from [him] like that."  He told Mons that the victim was not safe whenever he was not around to speak with the victim and that the last time the defendant left the house the victim was "molested" by Mons's son.  At 8 P.M., Fisher spoke to the defendant on the telephone, and the defendant told Fisher he was going to the library to return a video and asked if Fisher needed anything.  Fisher did not notice anything unusual about the defendant's behavior.

At 11 P.M., the defendant packed various items into a backpack, including rope, duct tape, a first-aid kit, a flashlight, scissors, two utility tools, and a knife in a sheath.  It was raining, and the defendant put on a poncho to walk the twenty minutes to Mons's house.  He did not take his Jeep vehicle because it was loud and might wake someone.

Arriving at the house, the defendant cut the telephone lines on the exterior of the house.  He entered the house by sliding open the screen on a window above a bulkhead and then climbing in through the window.  Once inside the house, he took off his boots and went down to the basement of the house where he took off his wet clothes and turned off the electricity to the house at the circuit board.  He also cut the telephone line inside the house.

The defendant then went to the victim's bedroom where he sat with her before eventually carrying her to the basement. After sitting with the victim for some time, the defendant placed a hand over the victim's mouth and cut her throat three times, each time deep enough to reach the victim's spinal column.  The defendant then wiped his hands with a towel and used disinfecting wipes from the kitchen to clean the light switch in the basement and further clean his hands.  The defendant then repacked his belongings into his backpack and left the house through the window by which he had entered.

At 3:45 A.M., Fisher received a call from the defendant's telephone, and when he answered he only heard someone gasping for breath and gagging.  Thinking the defendant might have hurt himself, Fisher went to the camper to check on the defendant. He found the camper empty but discovered a note addressed to him that purported to be the defendant's last will and testament and

stated the defendant's intent to leave all of his property to Fisher. Concerned, Fisher's wife called the police. Thereafter, Fisher's wife found another note in the camper, this one addressed, "To whom it may concern." In the note, the defendant wrote, in relevant part: "I am sorry for what sins I have committed. Sending [the victim] to heaven was the only way I could think of to protect her. I dont want any of my children to grow up + suffer with mental illness the way I have. [The victim] is the only one I can still save. . . Please notify my family of my passing."

At 4:10 A.M., Officer Joshua Ellender of the Mansfield police department arrived at Fisher's house, spoke to Fisher briefly, and then left to look for the defendant. Officer Ellender found the defendant one-quarter mile from Fisher's house, walking in the direction of the house. Ellender asked the defendant if he was all right and questioned why he was walking in the rain. The defendant answered that he was all right and that he had gone to a pharmacy to fill a prescription and was on his way home. Ellender offered to drive the defendant home, and the defendant accepted. Ellender asked the defendant a few questions in the police cruiser, and the defendant responded in a "very timid high-pitched voice." When they arrived at Fisher's house, Fisher told Ellender about the second note, and the officer asked the defendant if he had hurt

anyone. The defendant responded that he had and told Ellender and Fisher that he had killed his daughter. Ellender then handcuffed the defendant and, after the defendant stated that the knife was in his backpack, the officer took the backpack from him. While sitting in the back of the police cruiser, the defendant said that he deserved to die and began hitting his head against the partition in the cruiser, but stopped when Ellender asked him to; the defendant later asked Ellender to shoot him.

Police responded to Mons's house, where they awoke Mons and discovered the victim's body in the basement under a blanket.

Willa Griffin, the defendant's mother, testified that, at some point after the defendant began dating Mons, the defendant had told her in a telephone call that he had "found a doctor that could draw up the papers" for him to obtain Social Security disability benefits and that he was going to apply to get the benefits. The defendant again telephoned his mother in early or mid-July 2009, and asked if she thought the victim "would be better off in heaven." His mother responded that everyone would be better off in heaven, but that only God could make that choice. Later, on the evening of July 22, 2009, the defendant again telephoned his mother and asked to come home to live with her in Florida because he could not stay any longer in the place where he was currently living. She told him that he could come

home and agreed to pay for the rental truck he would need to transport his belongings. On July 23, the defendant telephoned his mother between 6 P.M. and 7 P.M. and told her that he was going to postpone coming to Florida until the beginning of August because he needed his Social Security money to pay for gasoline and because he thought he might have "permanent housing" by Saturday.[4] He ended the call by saying, "And no matter what happens, know I love you." After the killing of the victim, the defendant spoke again with his mother by telephone; the telephone call was recorded, and an excerpt was played at trial. In response to her question about whether he told the police that God had told him to kill the victim, he told her that he did not tell them that; he said he told the police that he "prayed and [God] gave [him] two choices."

The defendant was booked and, after waiving the Miranda rights, gave two interviews to police that morning. In the statements, the defendant explained what had happened that night. The defendant stated that, after the telephone call with Mons, he was upset and wished to hurt Mons. He played videogames for a few hours and attempted to sleep but could not. He stated that he then began praying to God, and God told him that the only way to protect the victim was to send her to heaven. He packed many of the supplies into his backpack with

---

[4] July 23, 2009, was a Thursday.

the intent of hurting Mons, but while he was walking to Mons's house, God told him that he was not to harm Mons, but that he needed to protect the victim by sending her to heaven. He stated that, once he was in the house, he had a conversation with God where he told God that he did not want to hurt the victim, but God told him that it was the only way to protect her and that, if the defendant did not send her to heaven, any harm that befell her in the future would be on the defendant's conscience. The defendant also expressed his belief that if Mons's son were released from the residential treatment facility, he would molest the victim again. The defendant explained that, after he killed his daughter, he attempted to kill himself, but was unable to.

During the interviews, the defendant also described his anger at Mons. He stated that Mons was responsible for making him homeless, that she had turned her back on him, that she had been in a sexual relationship with Anthony at the same time she was having a sexual relationship with the defendant, and that she did "what she wants, when she wants, with who she wants." He stated that he wanted Mons "to understand what she had done to [him]."

Through the defendant's statements to police and Mons's testimony, evidence was presented regarding the defendant's mental health history. The defendant stated during the police

interviews that he began receiving disability benefits for bipolar disorder, severe depression, and suicidal ideation two years earlier and that he took antidepressant and mood-stabilizing medications.  He recounted that he had taken his morning medication on July 23, but had not taken his evening medication that night.  He told police that he had attempted suicide several times, most recently two weeks prior to the killing, that he had had a major breakdown in 2005, and four or five hospitalizations for mental health reasons between August of 2005 and October of 2006.  At various times throughout the interviews, the defendant spoke in a voice that was described as high-pitched or meek and, as one of the officers explained, at times, so soft that the officer had to lean in to understand him.[5]

Mons testified that she knew the defendant to be depressed at times and to take an antidepressant, but that he was mostly depressed when they were having fights about his fidelity.  Mons also testified that, other than the hospitalization following the argument about his relationship with his ex-wife, she did not remember the defendant being hospitalized at any point when he lived with her and that she was not aware of any suicide attempts by the defendant around 2006.  She further testified

---

[5] Video recordings of both interviews were played for the jury.

that the high-pitched voice he used while being interviewed was normal for him.

There was also testimony about the defendant's religious practices. The defendant explained in his statements to police that he considered himself "spiritual" but did not belong to any particular religion. He stated that every night he would call the victim and tell her to say her prayers and that he tried to take the victim to church but that Mons would not allow it. Mons testified that the defendant was not a very religious person, and that she only knew of the defendant going to church twice during the time that she knew him. A search of the camper he was staying in at the time of the killing turned up no Bible or other religious materials.

At trial, the defendant did not contest that he had killed his daughter, but argued that he lacked criminal responsibility at the time of the killing. The defendant requested and was granted funds to retain a forensic psychiatrist and a psychiatric consultant, but neither the Commonwealth nor the defendant at trial offered expert testimony regarding the defendant's mental health or his criminal responsibility.

Discussion. We address in turn each of the defendant's claims on appeal.

1. Sufficiency of the evidence of criminal responsibility. "[A] required finding of not guilty by reason of lack of

criminal responsibility may rest on the failure of proof of criminal responsibility." Commonwealth v. Lawson, 475 Mass. 806, 812 (2016).[6] In Lawson, we declared that "[t]he inference that a defendant is probably sane because most people are sane is not strong enough alone to permit a rational finder of fact to conclude that a defendant is criminally responsible beyond a reasonable doubt". Id. at 814. But we reaffirmed our long-standing law that the Commonwealth need not call an expert witness to prove criminal responsibility in every case and "may prove criminal responsibility through the inferences arising from the circumstances of the offense, including evidence that the defendant planned the offense, acted on a rational motive, made rational decisions in committing the offense and in avoiding capture, and attempted to conceal the offense or his or her role in the offense." Id. at 816, citing Commonwealth v. Cullen, 395 Mass. 225, 229-230 (1985); Commonwealth v. Ricard, 355 Mass. 509, 515 (1969).

To prove a defendant criminally responsible where, as here, there is no claim of voluntary intoxication, the Commonwealth must prove beyond a reasonable doubt:

---

[6] We declared in Commonwealth v. Lawson, 475 Mass. 806, 816 (2016), that a defendant's motion for a required finding of not guilty by reason of lack of criminal responsibility shall be considered only at the close of all the evidence. Here, the timing of the motion was without consequence because the defendant rested without presenting any evidence.

> "1. That at the time of the alleged crime the defendant did not suffer from a mental disease or defect; or
>
> "2. That if the defendant did suffer from a mental disease or defect, he nonetheless retained the substantial capacity to appreciate the wrongfulness or criminality of his conduct and to conform his conduct to the requirements of the law."

Model Jury Instructions on Homicide 10 (2013). See Commonwealth v. Keita, 429 Mass. 843, 849-850 (1999), citing Commonwealth v. McHoul, 352 Mass. 544, 546-547 (1967). In evaluating the sufficiency of the evidence, we "examine the evidence in the light most favorable to the Commonwealth and determine whether 'the evidence and the inferences that reasonably could be drawn from it were "of sufficient force"' to permit a rational finder of fact to conclude that the defendant was criminally responsible beyond a reasonable doubt." Lawson, 475 Mass. at 816, quoting Commonwealth v. Scott, 472 Mass. 815, 820 (2015).

Here, although there was no expert testimony that the defendant was criminally responsible, the evidence viewed in the light most favorable to the Commonwealth permitted the jury to find that the defendant was criminally responsible beyond a reasonable doubt. There was evidence that the defendant appeared to be acting normally in the days leading up to the killing, that he helped Fisher care for Fisher's father, and that he prepared his "last will and testament" before he left the camper to commit the killing. There was also evidence that

the defendant carefully planned the killing before he left the camper by assembling all of the materials he might need during the assault and placing them in his backpack.  He decided to walk to Mons's house in the rain rather than drive his Jeep there because he feared the noise of the Jeep would alert the occupants that he had arrived.  When he arrived at Mons's house, he took the precaution of preventing any land-line telephone calls for help from the occupants by cutting the telephone lines both outside and inside the house.  By turning off the electricity in the house, he also ensured that any occupants who awoke would be left in the dark, leaving him with the potential advantage of his flashlight.  After killing the victim, he methodically sheathed his knife, wiped his hands, cleaned the basement light switch with disinfecting wipes, repacked his backpack, and left the house without waking anyone.

The evidence also supported a motive for the killing arising from his anger at Mons for making him homeless, for having a sexual relationship with him and Anthony at the same time, and for planning to take his daughter with her to North Carolina to live with Anthony, her new boy friend.  In the second note found in the camper, he wrote that he was "sorry for what sins" he planned to commit and that he "pray[ed] for gods mercy," which allows the inference that he recognized that the killing was morally wrong.

The jury were entitled to discredit the statements made by the defendant to police that he killed his daughter on a direct command from God, especially where there was no indication that he was deeply religious. The jury were also entitled to conclude that the defendant overstated the severity of his mental illness where there was evidence that he had falsely claimed to be suicidal in the past to garner sympathy from Mons and where he overstated his mental health symptoms and hospitalizations in speaking with the police.

From this evidence, a rational jury could reasonably conclude beyond a reasonable doubt that the defendant appreciated the wrongfulness of his conduct and that he had the ability to conform his conduct to the law. See Lawson, 475 Mass. at 817-818 (considering circumstances of crime, as well as motive, in finding sufficiency of evidence of criminal responsibility). Cf. Commonwealth v. Kostka, 370 Mass. 516, 538 (1976) (evidence of planning and motive supports criminal responsibility of defendant).

2. Ineffective assistance of counsel. The defendant argues that his trial counsel was ineffective because, even though his sole defense was lack of criminal responsibility, counsel told the jury in his opening statement that the defendant's conduct was "not psychotic."

The defendant did not file a motion for a new trial and therefore rests his claim of ineffective assistance of counsel solely on the trial record. Such ineffective assistance of counsel claims are "the weakest form of such a challenge" because they lack "any explanation by trial counsel for his actions." Commonwealth v. Peloquin, 437 Mass. 204, 210 n.5 (2002). Examining this claim under G. L. c. 278, § 33E, "we review the trial record alone to determine whether a defense counsel's strategic or tactical decision questioned on appeal was manifestly unreasonable when made and, if so, whether the unreasonable decision resulted in a substantial likelihood of a miscarriage of justice." Commonwealth v. Brown, 462 Mass. 620, 629 (2012).

Considering this claim in the context of trial counsel's entire opening statement, as well as the evidence at trial, we conclude that counsel's remark was not manifestly unreasonable. Trial counsel stated in relevant part in opening statement:

> "So what we have here is [the defendant] unable to appreciate the criminality of his conduct nor understand the requirements of law and conform his conduct to the law because of really defective thinking. . . . [P]eople with defective brain or defective minds because of some disease or defect still can function. So the fact that he functioned is not manifest of how he was thinking. . . . [H]e had a discussion with God, a prayer from God, and this is a debate with God. It's not psychotic. It's a debate with God. That clearly I suggest to you should show you that there was a defect in his ability to reason, and a defect in his ability to perform his conduct under the requirements of law."

Trial counsel in this case was confronting extensive evidence that the defendant planned to commit the crime and made considerable efforts to avoid detection while committing the crime. He appears to have been attempting to explain to the jury how the evidence would show that the defendant was not criminally responsible even though he appeared to make calculated, reasoned choices. Counsel appears to have been using the term "psychotic" to refer to individuals who have significant functional limitations due to a mental illness, and attempting to contrast that with his view of the defendant as someone who was highly functional but had a "defect in his ability to reason" caused by mental illness that resulted in a lack of criminal responsibility. By admitting that the defendant's conduct was "not psychotic," trial counsel was not abandoning the defense of lack of criminal responsibility; instead, he was attempting to tailor it to the facts he was given.[7] This strategic choice was not manifestly unreasonable in this context and under these circumstances. See Commonwealth v. Denis, 442 Mass. 617, 626 (2004) (concession that defendant was

---

[7] The defendant does not challenge trial counsel's decision not to call a forensic psychologist as a defense witness. Without such an expert, trial counsel reasonably could have anticipated that the jury would not hear any opinion that the defendant was "psychotic," and therefore may reasonably have sought to address this weakness in his defense in his opening statement.

shooter not manifestly unreasonably where consistent with only viable defense); Commonwealth v. Arriaga, 438 Mass. 556, 581-583 (2003) (concession of guilt not manifestly unreasonable where it "does not undercut viable defenses").

3. <u>Improper remarks by prosecutors in opening statement and closing argument</u>. The defendant argues that the two prosecutors made improper remarks in their opening statement and closing argument. In his opening statement, one prosecutor referred several times to the victim's death as a "murder" and to the defendant as having "murdered" the victim. The defendant objected at the conclusion of the prosecutor's opening statement. In response, the judge promptly gave a strong curative instruction in which she explained to the jury that "murder" is a legal term, that they would be instructed regarding what the Commonwealth needed to prove for the jury to find "murder," and that the issue whether the victim was murdered was ultimately for them to decide, notwithstanding any opinion of the prosecutor.[8]

_____

[8] The judge's full instruction on this point is as follows:

"During the opening, the Commonwealth several times characterized the actions of the defendant as that you would be hearing testimony that he murdered [the victim]. The word murder is a legal term. At the end of this trial, I'll be giving you specific instructions as to just what it is that the Commonwealth has to prove to the extent that that reflected an opinion by the Commonwealth, an opinion by the Assistant District Attorney that the killing, a

The defendant is correct that it was improper for the prosecutor to refer to the killing as a "murder" in his opening statement where the question whether the killing was, in fact, a murder was the ultimate question before the jury. However, the judge's instruction on this point was sufficient to cure even the modest risk of prejudice that resulted from the prosecutor's statements. See Commonwealth v. Almonte, 465 Mass. 224, 235-236 (2013).

The defendant also claims that the other prosecutor's repeated statements during her closing argument that the defendant's behavior was not consistent with mental illness were unsupported by the evidence and allowed the prosecutor to "essentially testify[] as an unqualified expert witness." Similarly, the defendant contends that the prosecutor's statement that the only evidence that the defendant suffered from mental illness was from the defendant's "self-serving statements" denigrated his defense of lack of criminal responsibility. Neither of these statements was improper.

---

killing amounted to murder. You should disregard it. This is not the place for argument and at the end of the case, you will be able to hear argument and the attorneys may be able to argue to you that from the evidence that you've heard of a killing, the elements of murder are met, but to the extent that there's anything in that that reflected a personal opinion of murder as opposed to evidence of a killing ultimately will be for you to determine whether the Commonwealth has met its burden that any killing amounted to murder."

As noted earlier, in determining whether a defendant was criminally responsible, a jury may decide whether the defendant suffered from a mental disease or defect, and they may reach this determination without expert evidence based on rational inferences from the defendant's relevant conduct. See Lawson, 475 Mass. at 807, 815-816. Where, as here, no expert evidence was offered, a prosecutor does not "testify[] as an unqualified expert witness" when he or she argues in closing that the defendant did not suffer from a mental disease or defect based on evidence such as the defendant's deliberate planning and orchestration of the killing, and the inconsistencies between his description of his own mental health history and the testimony of other witnesses who knew him during the relevant time period. See Commonwealth v. Lyons, 426 Mass. 466, 473-474 (1998) (prosecutor's comment on credibility of criminal responsibility defense was proper where based on evidence).

As to the prosecutor's characterization of the defendant's statements to police regarding his mental health history as "self-serving," it was not improper for the prosecutor to argue to the jury that the defendant's statements to police were not credible because the defendant had a motive to exaggerate or fabricate his mental health symptoms. The trial judge properly instructed the jury that, in evaluating the credibility of witnesses, the jury could consider whether "the witness [stood]

to gain or lose anything depending upon how this case comes out"; if so, whether "that . . . color[ed] the witness's testimony"; and whether "the witness ha[d] an incentive or motive to testify in a certain fashion."  See Massachusetts Superior Court Criminal Practice Jury Instructions § 1.8, at 1-25 (Mass. Cont. Legal Educ. 1999 & 1st Supp. 2003).  The prosecutor's suggestion to the jury that they should find the defendant's statements to the police not to be credible because they were self-serving invited the jury to do nothing more than what the judge invited them to do in her instructions.  See Commonwealth v. Espada, 450 Mass. 687, 699 (2008).

4.  <u>Instruction on the consequences of a verdict of not guilty by reason of lack of criminal responsibility</u>.  The defendant requested an instruction on the consequences of a verdict of not guilty by reason of lack of criminal responsibility as provided in Commonwealth v. Mutina, 366 Mass. 810, 823 & n.12 (1975) (Mutina instruction).  The judge gave such an instruction to the jury, one that followed almost verbatim the instruction set forth in the current Model Jury Instructions on Homicide.[9],[10]  See Model Jury Instructions on

---

[9] At the time this case was tried, the current Model Jury Instructions on Homicide had been issued as proposed revisions, but had not yet been adopted by the court.  Subsequent to the trial in this case, in Commonwealth v. Chappell, 473 Mass. 191, 206, 209 (2015) (Appendix), we proposed a new provisional

Homicide 11-12 (2013).  The defendant did not object to the
content of that instruction.

---

instruction on the consequences of a verdict of not guilty by
reason of lack of criminal responsibility.

[10] The judge instructed the jury regarding the consequences
of a verdict of not guilty by reason of lack of criminal
responsibility as follows:

"As I have previously instructed, your discussion
should be based on the evidence and the law of this case
without regard to the possible consequences of the
verdicts.  You may not consider sentencing or punishment in
reaching your verdicts.

"However, I am going to tell you what happens to a
defendant if he is found not guilty by reason of lack of
criminal responsibility.  The Court may order the defendant
to be hospitalized at a mental health facility for a period
of 40 days for observations and examination.  During this
observation period, or within 60 days after a verdict of
not guilty by reason of lack of criminal responsibility,
the district attorney or other appropriate authorities may
petition the Court to commit the defendant to a mental
health facility or to Bridgewater State Hospital.  If the
Court then concludes that the defendant is mentally ill and
that his discharge would create a substantial likelihood of
serious harm to himself or others, the Court may grant the
petition and commit him to a proper mental facility or to
Bridgewater State Hospital for six months.

"Periodically thereafter, the Court reviews the
order of commitment.  If the person is still suffering from
a mental illness or defect and is still dangerous, he is
kept in the mental facility.  If the person is no longer
mentally ill and can resume a normal life, he is
discharged.

"The district attorney must be notified of any hearing
concerning whether the person may be released, and the
district attorney may be heard at any such hearing.
However, the final decision on whether to recommit or
release the person is always made by the judge.  This is
what happens if you find the defendant not guilty by reason
of lack of criminal responsibility."

The defendant now argues that this instruction created a substantial likelihood of a miscarriage of justice insofar as it left the jury with the impression that, if they found the defendant not guilty by reason of lack of criminal responsibility, the defendant could be released from custody at any time. In Commonwealth v. Chappell, 473 Mass. 191, 205-206 (2015), we addressed a similar claim where the defendant proposed a modified Mutina instruction that was not adopted by the trial judge, who gave the model instruction.[11] Although we set forth a proposed modification to the model Mutina instruction, we concluded that the Mutina instruction in the current Model Jury Instructions on Homicide accurately stated the law regarding the commitment of individuals found not guilty by reason of lack of criminal responsibility and that the judge did not err in giving it. Chappell, supra at 205-206, 208-209 (Appendix). We reach the same conclusion here.[12]

---

[11] In Chappell, 473 Mass. at 205, the defendant requested that the judge modify the model Mutina instruction in several respects, including a request that the judge instruct the jury that "if the defendant were still suffering from a mental illness and still dangerous, '[t]here is no limit to additional commitments [following the initial commitment of six months] and the defendant could be committed for the rest of his life.'"

[12] The defendant argues alternatively that trial counsel was ineffective for requesting a Mutina instruction without more favorable language. Where the model instruction accurately reflected the law, counsel neither erred nor was ineffective for failing to request language that was more beneficial to the defendant than that provided by the model instruction.

5. Review pursuant to G. L. c. 278, § 33E. In reviewing the entire record of the case pursuant to our obligation under G. L. c. 278, § 33E, we address one additional issue. The trial judge, in instructing the jury on the issue of criminal responsibility, declared, "[I]f you feel it appropriate, you may take into account that the great majority of people are sane and that there is a resulting likelihood that any particular person is sane." In Keita, 429 Mass. at 846, we directed that such an instruction should be given in every case where the question of criminal responsibility is raised. Such an instruction was also included in the Model Jury Instructions on Homicide effective at the time of the trial. See Model Jury Instructions on Homicide 51 (1999).

We omitted this instruction in the criminal responsibility section of the current Model Jury Instructions on Homicide. Model Jury Instructions on Homicide 1-12 (2013). And in Lawson, 475 Mass. at 815 n.8, we concluded that juries should not be instructed regarding such an inference due to "the meager weight of this inference and the risk of juror confusion regarding the burden of proof." Where the trial judge strongly and specifically instructed that the burden is on the Commonwealth to prove criminal responsibility beyond a reasonable doubt and where there was substantial evidence supporting the jury's finding of criminal responsibility, we conclude that this

instruction did not create a substantial likelihood of a miscarriage of justice.

Conclusion. We have reviewed the entire record of the case pursuant to our duty under G. L. c. 278, § 33E, and find no reason to exercise our authority to order a new trial or to reduce the verdict of murder in the first degree. The judgments of conviction are affirmed.

So ordered.