NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReportersjc.state.ma.us

SJC-11950


COMMONWEALTH  vs.  JOSEPH WRIGHT.



Essex.      November 10, 2017. - March 15, 2018.

Present:  Gants, C.J., Gaziano, Lowy, Budd, & Cypher, JJ.


Homicide.  Constitutional Law, Admissions and confessions,
    Voluntariness of statement.  Evidence, Admissions and
    confessions, Voluntariness of statement, Expert opinion,
    Exculpatory, Intoxication.  Mental Impairment.
    Intoxication.  Practice, Criminal, Capital case, Admissions
    and confessions, Voluntariness of statement, Discovery,
    Assistance of counsel, Preservation of evidence.  Witness,
    Expert.



Indictments found and returned in the Superior Court
Department on June 28, 2012.

A pretrial motion to suppress evidence was heard by Richard
E. Welch, III, J., and the cases were tried before Howard J.
Whitehead, J.


David H. Mirsky (Joanne T. Petito also present) for the
defendant.
Marcia H. Slingerland, Assistant District Attorney, for the
Commonwealth.


CYPHER, J.  The defendant, Joseph Wright, appeals from two

convictions of murder in the first degree.  He urges the

reversal of his convictions on four grounds.  First, he contends that the pretrial motion judge erroneously denied his motion to suppress statements he made to Canadian law enforcement officers.  Second, he argues that the trial judge committed a reversible error in ordering the pretrial disclosure of the defendant's mental health expert's report regarding the defendant's mental condition at the time of the crimes, which the prosecution had in its possession during its subsequent cross-examination of the defendant.  Third, the defendant argues that the evidence at trial demonstrates his lack of criminal responsibility for the murders, and relatedly, that his trial counsel's failure to argue a lack of criminal responsibility defense before the jury constitutes ineffective assistance of counsel.  Fourth, he argues that State police investigators failed to collect certain evidence relevant to his intoxication at the time of the crimes, thereby denying the defendant his right to a "complete defense."  Having considered the defendant's arguments, and, more broadly, "the whole case on the law and the facts" pursuant to our duty under G. L. c. 278, § 33E, Commonwealth v. Howard, 469 Mass. 721, 747 (2014), we affirm the convictions.

Factual and procedural background.  We recite the facts the jury could have found in the light most favorable to the

Commonwealth, but we reserve certain details of the facts and proceedings for discussion of the individual issues.

The defendant does not dispute that he killed his mother, Donna Breau, and his grandmother, Melba Trahant, at their residence in Lynn on April 30, 2012. Following the killings, the defendant drove to the Canadian border at Belleville, New Brunswick, where he arrived at approximately 6 P.M. on May 1, 2012. After hesitating in responding to questions posed by a Canadian border services officer about his presence in Canada, the defendant fled across the border, and was quickly apprehended by a member of the Royal Canadian Mounted police. The defendant subsequently confessed to the murders of his mother and grandmother during an interview with two Canadian border officers. The defendant told the officers that he had slit the victims' throats and left their bodies behind a local elementary school.[1]  (Unbeknownst to the Canadian officers, the victims' bodies had been found at 6:45 A.M. that day on the grounds of the elementary school; both women appeared to have suffered "pretty severe" neck wounds.)

Custody of the defendant was transferred to United States authorities, and in June, 2012, a grand jury returned two

---

[1] We save our discussion of the details of the defendant's arrest and interrogation by Canadian law enforcement officers, as well as the defendant's pretrial motion to suppress those statements, for our analysis of that issue.

indictments charging the defendant with murder in the first degree of his mother and grandmother.  Before trial the defendant moved to suppress his statements to the Canadian authorities on the grounds that they were involuntary and that he had not been given his Miranda warnings, but his motion was denied.  The defendant was then tried before a jury in the Superior Court between June 10 and 23, 2014.  The prosecution proceeded under the theories of deliberate premeditation and extreme atrocity or cruelty.  The defense's theory was that, although the defendant admitted to the killings, they did not constitute murder in the first degree because the defendant had a "diminished capacity" due to drugs and alcohol, and therefore he could not have deliberately premeditated or acted with extreme atrocity or cruelty.

The defendant took the stand as the sole defense witness.[2] Although the defense had, before trial, provided notice of the testimony of an expert psychologist who would testify as to the defendant's mental condition at the time of the killings, the defense ultimately chose not to call the expert, who had prepared a report, appeared on the witness list, and was available to testify.

---

[2] Before testifying, the defendant affirmed in a colloquy with the judge that his decision to take the stand was his own and that he was not pressured into doing so.

From an early age the defendant heavily abused drugs and alcohol. At ten years old he began smoking marijuana, and at thirteen he started drinking hard alcohol. At fifteen, and for approximately the next two years, the defendant was in a residential program for marijuana and alcohol abuse. His habitual drug abuse continued into adulthood, as the defendant ingested (in his words) "anything [he] was able to [stick] in [his] face," including mushrooms, "Ecstasy," cocaine, "crack" cocaine, and heroin. He also abused a variety of over-the-counter and prescription drugs.

At age twenty-two the defendant became unemployed and moved in with his mother in her second-floor apartment in Lynn. His grandmother, who was in her eighties and had a close relationship with the defendant, lived in the apartment on the first floor. The defendant had only intermittent contact with his mother throughout his childhood because she was in Florida and in and out of jail with her own drug problems. She eventually returned to Lynn when the defendant was sixteen or seventeen, but he avoided contact with her until he was eighteen or nineteen because "she wasn't there when [he] was a kid." Upon moving in with her, the defendant testified, "things just started getting out of hand" in terms of the pair's substance abuse, and it was "pretty much a big party." The defendant's mother gave him her prescribed Klonopin, Ativan, and Wellbutrin

medications.  The defendant was also regularly smoking marijuana, snorting and injecting heroin, and smoking crack cocaine.

The defendant testified to the details of the killings.  He had been abusing his mother's Klonopin virtually "nonstop" since his birthday on April 9.  Also, after having a cyst removed from his forehead four or five days before April 30, the defendant began hearing a voice inside his head.  On the evening of April 30, the defendant recalled going to the liquor store and purchasing two forty-ounce containers of beer, which he brought home and drank with his mother at about 6 or 7 P.M.  Before leaving the apartment to purchase marijuana, the defendant ingested a "handful" of Klonopin.  He brought home the marijuana and smoked it with his mother.  His grandmother was downstairs in her apartment, and at some point his mother went to bed.

While the defendant sat on a recliner in the living room of his mother's apartment, he heard a voice inside his head, and the thought of killing his mother entered his mind.  He began walking to the entranceway of his mother's bedroom, and the voice he heard was telling him to kill her.  He recalled being at the doorway, seeing his mother asleep on the bed, and walking away.  The defendant then obtained a knife from the kitchen, went into his mother's bedroom while she slept, and slashed her throat.  He did not remember if she asked for help, but did

recall she told him he was "fucked" and admitted to watching her "bleed[] out" on the bed.

At some point during the night, the defendant took the same knife he used to kill his mother and went downstairs to his grandmother's apartment, where he found her in the living room. The defendant was not hearing any voice inside his head telling him to kill his grandmother, but he thought she saw blood on him and that she was going to call the police. The defendant walked up to her from behind, put a pillow over her face, and slashed her throat. She asked the defendant why he had done that, and died in front of him.

The defendant awoke at some point in the early morning on May 1, 2012. Not immediately recalling what had occurred, he was shocked to find blood on the kitchen floor; he walked into his mother's bedroom and found her dead with a "lot of blood," and went downstairs and found his grandmother "dead on her couch." The defendant "freaked out" and took more drugs and alcohol. He left the bodies at a nearby elementary school and fled to Canada. Following deliberations, the jury found the defendant guilty of the murders of both victims on the theory of extreme atrocity or cruelty, and the defendant was sentenced to consecutive life terms. Forgoing a motion for a new trial, the defendant filed a timely notice of appeal in June, 2014, and the case was entered in this court the following year.

Discussion.  1.  Defendant's statements to Canadian authorities.  The defendant first challenges his convictions on the ground that his statements to Canadian border officers were involuntary and therefore inadmissible.  The voluntariness of the defendant's statements was not a live issue at trial, so the issue was not submitted to the jury.  See, e.g., Commonwealth v. Sheriff, 425 Mass. 186, 193 (1997).[3]  Yet the defendant did move to suppress those statements before trial, and also objected to their introduction at trial through the testimony of certain Canadian law enforcement officers.  We therefore treat the defendant's argument as a claim of error in the denial of his pretrial motion to suppress.

We briefly recount the relevant facts concerning the defendant's statements to the Canadian authorities, as found by the motion judge following an evidentiary hearing.[4]  At

---

[3] The defendant testified on direct examination that the Canadian authorities allowed him to rest before the interview, and did not yell, threaten, or otherwise coerce him during the interview.  Following the close of evidence, defense counsel specifically asked "not to give the voluntariness" instruction (also known as a "humane practice" instruction), based on his concern that it might "water down" the requested DiGiambattista jury instruction, which applies where there is no recording of a defendant's interrogation, as here.  Commonwealth v. DiGiambattista, 442 Mass. 423 (2004).  The trial judge provided the jury with the DiGiambattista instruction.

[4] "In reviewing a ruling on a motion to suppress, we accept the judge's subsidiary findings of fact absent clear error but conduct an independent review of his ultimate findings and conclusions of law" (citation and quotations omitted).

approximately 8 P.M. on May 1, 2012, the defendant was apprehended after illegally crossing the border into Canada -- specifically, the port of entry at Woodstock, New Brunswick, which borders Houlton, Maine. He was arrested by a member of the Royal Canadian Mounted police (RCMP), who read the defendant a "caution" that stated: "[Y]ou need not say anything, you have nothing to hope from any promise or favor and nothing to fear from any threat whether or not you say anything. Anything you say may be given in evidence. Do you understand?" The defendant indicated he understood, and said he wished to speak to an attorney. This information was relayed to Canadian border officers at the Woodstock crossing, where the RCMP officer brought the defendant. Upon his arrival, the border officers asked the defendant, who was in custody, to disrobe, because there was blood on the defendant's clothing that the officers wished to preserve as potential evidence. The defendant did not appear to be under the influence of any drugs or alcohol, but informed the officers that he had smoked "a little" marijuana that day.

The defendant was then taken by two border officers to an interview room. The defendant was not handcuffed and appeared "fully oriented." One of the officers read the defendant a

Commonwealth v. Weaver, 474 Mass. 787, 793 (2016), cert. denied, 137 S. Ct. 809 (2017).

"secondary caution," similar to the one read to him by the RCMP officer, and informed him of his right under the Vienna Convention to speak with a member of the United States government. The officer also informed the defendant of his right to speak with "duty counsel," an attorney paid for by Canada to represent someone who does not have his or her own attorney, and the defendant indicated he would like to speak with duty counsel. The officer explained the charge the defendant was facing so that the defendant could inform duty counsel why he was being held (i.e., failing to stop and speak to immigration officers at the border).

At that point the defendant began to laugh and said, "That's nothing, jail here or jail there, it doesn't make any difference." He then asked the officers, "[D]o you want to know why I ran[?]" One of the officers interrupted the defendant and advised him for a third time that he did not have to say anything and that anything he did say might be used in evidence. The officer then asked the defendant why he ran. The defendant responded that he had killed his mother and grandmother by slitting their throats, and informed the officers what he had done with the murder weapon (the knife), where he had placed their bodies, and why he had committed the crimes. After these responses, the defendant "slumped down in his chair, stopped speaking, and appeared relieved." Throughout the confession the

defendant "was relaxed, calm, [and] never agitated," and understood what he was doing and what he was being asked. The defendant's statements were not recorded.

Before trial, the defendant argued that his statements should have been suppressed because they were not voluntary and the police did not give the defendant Miranda warnings before questioning him. The motion judge held first that because the defendant's statements were given to foreign police officers, Miranda v. Arizona, 384 U.S. 436 (1966), did not apply. The judge further concluded that "all the evidence points to the fact that [the defendant's] statements were made voluntarily and knowingly and [were] the product of his own rational intellect."

We discern no error in these conclusions. First, we have previously held that Miranda does not govern interrogations "carried out by foreign officials in a foreign country," and that statements made to foreign police are admissible if they were voluntary. Commonwealth v. Wallace, 356 Mass. 92, 96-97 (1969).[5] We explained that "applying the Miranda rule to foreign police officers will not affect their conduct, and therefore we decline to so extend the scope of that decision." Id. Numerous courts that have more recently addressed this question have reached the same conclusion. See, e.g., United States v.

---

[5] Wallace, like this case, involved a defendant's statements made to Canadian law enforcement officers. Commonwealth v. Wallace, 356 Mass. 92, 96-97 (1969).

Yousef, 327 F.3d 56, 145 (2d Cir.), cert. denied, 540 U.S. 933 (2003) ("the law is settled that statements taken by foreign police in the absence of Miranda warnings are admissible if voluntary"); Fisher v. United States, 779 A.2d 348, 353-354 (D.C. 2001), cert. denied, 534 U.S. 1095 (2002). "[B]ecause the United States cannot dictate the protections provided to criminal suspects by foreign nations and one of the principal purposes of the exclusionary rule -- deterrence of unlawful police activity -- is absent when foreign [officers] direct an interrogation, a different rule applies to statements elicited by foreign officials." United States v. Abu Ali, 528 F.3d 210, 227 (4th Cir. 2008), cert. denied, 555 U.S. 1170 (2009). The defendant's statements to the Canadian authorities are admissible so long as they were voluntary.[6]

The motion judge did not err in concluding that the defendant's statements were indeed voluntary. "A voluntary statement is one that is the product of a rational intellect and

---

[6] While "courts recognize two exceptions to the general rule regarding the application of Miranda . . . in a foreign jurisdiction" -- (1) "where the investigatory conduct is so inconsistent with our notions of due process that it 'shocks the conscience' of a [United States] court," and (2) "when a foreign officer acts as an agent of [United States] law enforcement" (citation omitted), Fisher v. United States, 779 A.2d 348, 354 (D.C. 2001), cert. denied, 534 U.S. 1095 (2002) -- neither exception applies here. The first is plainly not at issue, and as for the second, the pretrial motion judge specifically found that the Canadian authorities were not acting as agents for United States law enforcement officers.

a free will, and not induced by physical or psychological coercion" (citation and quotations omitted). Commonwealth v. Monroe, 472 Mass. 461, 468 (2015). As mentioned, the motion judge found that there were no signs the defendant was intoxicated or otherwise did not understand what he was doing or being asked; the judge also found no evidence of "trickery," "physical distress," or "that [the defendant] was made any promises or any threats." The defendant does not dispute those factual findings (nor do we discern error in them), but he highlights the fact that the interrogation continued after he invoked his right to speak with duty counsel. This argument is unavailing, as the requirement that police halt questioning after an individual states he or she wishes to speak with an attorney stems from Miranda, 384 U.S. at 474, see Commonwealth v. Obershaw, 435 Mass. 794, 800 (2002), which does not apply here.[7]

2. Disclosure of expert report to the prosecution. Defense counsel clarified before trial that the defense theory would be based on the defendant's "diminished capacity" due to drug and alcohol abuse. Six weeks before jury selection, the defense offered its notice of expert witness, stating that it

---

[7] Hence, there was no error in the motion judge's conclusion that "the fact that [the defendant] had not yet talked to a lawyer does not in [any way] undermine [the] findings that . . . the evidence shows beyond a reasonable doubt that he made these statements voluntarily."

would call a psychologist, Robert H. Joss, to testify about the defendant's mental condition at the time of the crimes.[8]  By this time Joss had already prepared a report on the defendant's behalf, which included descriptions of "statements made by the defendant relevant to the issue of [his] mental condition" at the time of the killings, along with Joss's "opinions as to the defendant's mental condition."  Mass. R. Crim. P. 14 (b) (2) (B) (iii), as appearing in 463 Mass. 1501 (2012).

The Commonwealth responded a week later by filing a motion for reciprocal discovery regarding the defense expert, seeking, in pertinent part, "[n]otice as to whether . . . Joss intends to rely upon any statements of the defendant as the basis of his opinion or testimony at trial," and stating that if so, "the Commonwealth is entitled to an independent examination of the defendant" pursuant to Mass. R. Crim. P. 14 (b) (2) (B).  The motion was "allowed as to whether . . . Joss intends to rely upon statements of the defendant"; the ruling further stated

---

[8] The notice advised that the defendant would call Robert H. Joss to testify that "at the time of the offenses [the defendant] was undergoing an unusual pattern of indiscriminate substance abuse . . . and if not for this long history of drug abuse the killing of his mother and grandmother would not have happened."  Joss would further testify that "[the defendant] was experiencing the effects of a drug induced psychosis and dissociative experiences related to his mother[']s abandonment of him at the age of two at the time of the killings."  The notice did not clarify, as it was required to, whether Joss "intend[ed] to rely in whole or in part on statements of the defendant as to his . . . mental condition."  Mass. R. Crim. P. 14 (b) (2) (A) (iii), as appearing in 463 Mass. 1501 (2012).

that "[i]f [the defendant] provides notice that he intends to offer expert testimony as to his mental state based in part on his statements[,] the Commonwealth may request a [rule] 14 (b) (2) (B) examination" of the defendant by a court-appointed examiner.

The record does not reflect that the defense responded to the motion judge's order, however, and the prosecution did not ultimately seek an independent examination of the defendant. Before jury selection, on the first day of trial proceedings, the defense repeated to the trial judge its intention to call Joss as an expert witness. The judge then asked the prosecution, "[A]re you going to have somebody?" -- presumably referring to an expert of its own -- to which the prosecution responded, "No." Joss appeared on the witness list read to potential jurors. Following jury empanelment and just before opening statements, the prosecution said that while it did not seek an independent examination of the defendant, it did seek access to Joss's report. Over the defendant's objection, the judge "order[ed] that the report be turned over now, where there has been a commitment by the defense to the diminished capacity [of the defendant]."

The defendant argues that this order violated Mass. R. Crim. P. 14 (b) (2), which governs discovery related to expert testimony on the issue of the defendant's "mental condition."

The prosecution should never have received Joss's report, the defendant contends, because it never sought an independent, court-ordered examination of the defendant under rule 14 (b) (2) (B), which, he argues, is a prerequisite to the rule's requirement that a defendant provide his expert report to the prosecution. The defendant concludes that the prosecution's later use of Joss's report during its cross-examination of him violated his State and Federal rights against self-incrimination, and warrants reversal of his convictions.[9]

"As our task is to interpret a rule of criminal procedure, we begin with the plain language of the rule." Commonwealth v. Hanright, 465 Mass. 639, 641 (2013). Rule 14 (b) (2) provides

---

[9] As mentioned, the defendant took the stand in his own defense at trial. On direct examination he did not recount the details of the killings themselves. He testified that he did not immediately remember what happened between the time that he returned to his mother's apartment with marijuana, and when he woke up to find his mother and grandmother dead. The defendant stated that "about a week later" he "started really thinking hard," and remembered that he had been awake for "two days straight without sleeping," and that he heard a voice in his head "telling [him] to just kill [his] mother." He also recalled getting rid of the victims' bodies.

Before cross-examining the defendant, the prosecution sought permission to impeach the defendant with statements he made to Joss, which were incorporated into Joss's report. The judge ruled that while the prosecution could not introduce the statements themselves to impeach the defendant, it could use its knowledge of the content of those statements when formulating its cross-examination. While it is not entirely clear to what extent the prosecutor's knowledge of the contents of Joss's report guided his cross-examination of the defendant, the defendant did more fully recount the details of the killings during cross-examination.

the "[s]pecial [p]rocedures" governing pretrial discovery regarding defenses based on a criminal defendant's "[m]ental [h]ealth [i]ssues."[10]  Subdivision (b) (2) (A) requires a defendant to notify the prosecution if he "intends at trial to raise as an issue his or her mental condition at the time of the alleged crime, or . . . intends to introduce expert testimony on [his or her] mental condition at any stage of the proceeding." The next subdivision, (b) (2) (B), states that where it appears (based on [1] the defendant's notice of expert testimony, [2] "subsequent inquiry by the judge," or [3] "developments in the case") that the defendant's expert will rely on "statements of the defendant as to his or her mental condition . . . , the court, on its own motion or on motion of the prosecutor, may order the defendant to submit to an examination" consistent with

---

[10] As a preliminary matter, we are satisfied that the defendant's "diminished capacity" defense, which was to include expert testimony from a psychologist stating that the defendant was experiencing "a drug induced psychosis" at the time of the crime, implicates the defendant's "mental condition" such that it is subject to the "[s]pecial [pretrial discovery] [p]rocedures" of Mass. R. Crim. P. 14 (b) (2), as appearing in 463 Mass. 1501 (2012).  See Commonwealth v. Newton N., 478 Mass. 747 (2018), citing Mass. R. Crim. P. 14 (b) (2) (A) ("due to the complex nature of mental impairment, which is often presented at trial through expert testimony, we require defendants to provide the same notice regarding their intent to raise an issue of mental impairment at trial as we do their intent to raise a defense of criminal responsibility").  "[A]ll procedures and provisions applicable to such discovery are set out in rule 14 (b) (2)," and are not subject to the "automatic and discretionary [discovery] provisions" of rule 14 (a). Commonwealth v. Sliech-Brodeur, 457 Mass. 300, 319 (2010).

the detailed provisions of Mass. R. Crim. P. 14 (b) (2) (B) and (C).[11]

The same subdivision, (b) (2) (B) -- specifically, part (iii) -- also establishes a regime for the disclosure of mental health expert reports.  This disclosure occurs, in pertinent part, "after the defendant expresses the clear intent to raise as an issue his or her mental condition, [and] the judge is satisfied that (1) the defendant intends to testify, or (2) the defendant intends to offer expert testimony based in whole or in part on statements made by the defendant as to his or her mental condition at the relevant time."  Mass. R. Crim. P. 14 (b) (2) (B) (iii) (c).  While the paragraph in which this language appears refers to the disclosure of the court-appointed "examiner's report," the next paragraph clarifies that "[a]t the time [the examiner's report] is disclosed to the parties, the defendant shall provide the Commonwealth with a report of the defense psychiatric or psychological expert(s) as to the mental condition of the defendant at the relevant time."  Id.[12]

_____

[11] "As a practical matter, it is the prosecutor who recommends the expert psychiatrist for appointment as the examiner.  We have recognized the court-appointed examiner as an agent of the prosecution."  Sliech-Brodeur, 457 Mass. at 318 n.23.

[12] This provision ordering the disclosure of a defense expert's report was inserted as part of the 2012 amendments to the rule, following this court's opinion in Sliech-Brodeur, 457 Mass. at 324-326.  Sliech-Brodeur involved a pretrial discovery

The defendant argues that because rule 14 (b) (2) (B) (iii) contemplates an exchange of reports from both sides' experts -- one by the defense ("a report of the defense psychiatric or psychological expert") and another by the court-ordered examiner ("examiner's report") -- in a case where the prosecution has not sought a court-ordered examination, as here, a defendant has no independent duty to disclose his or her expert's report. We disagree. The fact that the rule discusses a defendant's disclosure obligation in tandem with that of the court-appointed examiner simply reflects the typical course in cases where a defendant pursues a mental health defense: after the defendant expresses his or her intent to pursue that defense, the prosecution will seek an independent examination regarding the defendant's mental condition at the time of the crime. Such was the sequence of events in Sliech-Brodeur, 457 Mass. at 310,

---

order requiring the defendant to furnish his mental health expert's notes and materials to the Commonwealth, who had secured an independent expert; the Commonwealth provided the defense materials to its expert, who relied on them when forming his own opinion about the defendant's criminal responsibility. Id. at 322. The court deemed this reversible error on the grounds that "nothing in [rule 14 (b) (2)] obligates a defendant, before trial, to provide the Commonwealth's expert . . . with copies of her own expert witness's notes and other materials." Id. at 321. Responding to "'confusion' surrounding the sequence of production of mental health experts' materials," the court also provided for the amendment of rule 14 (b) (2) "to require the defendant's expert to produce to the prosecution a report that includes the defense expert's opinion [as to the defendant's mental condition] and the bases and reasons for this opinion." Id. at 325-326.

which resulted in this provision.  While the rule affords the prosecution the opportunity to obtain an independent examiner, we do not interpret it to impose on the prosecutor an obligation to do so or otherwise be denied access to the defense expert's report.[13]

Mental health defenses like the instant one represent "complex issues for which the prosecutor should have time to prepare."  Reporter's Notes (2012) to Rule 14 (b) (2), Massachusetts Rules of Court, Rules of Criminal Procedure, at 197 (Thomson Reuters 2016).  See Sliech-Brodeur, 457 Mass. at 325 (explaining "our view . . . that the Commonwealth should have advance notice of complex mental health issues that the defendant intends to raise as part of his or her defense").  An effective "[r]ebuttal of [such defenses] requires a degree of expertise on the part of a cross-examiner that can only be gained through pretrial research."  Reporter's Notes (Revised, 2004) to Rule 14 (b) (2), supra at 195.  This includes access to the defense expert's report, without which the prosecution cannot effectively impeach the expert's or the defendant's own testimony during cross-examination, thereby undermining "rule 14

---

[13] That the court-appointed examiner is an optional, not mandatory, component of a prosecutor's trial strategy is bolstered by the plain language of the rule, which states that the court "may order the defendant to submit to an examination," not that it "shall" always do so (emphasis added).  Mass. R. Crim. P. 14 (b) (2) (B).

(b) (2) (B)'s truth-seeking function." Hanright, 465 Mass. at 644. See Commonwealth v. Durham, 446 Mass. 212, 230, cert. denied, 549 U.S. 855 (2006) (Marshall, C.J., dissenting) (recognizing "the importance that cross-examination plays in the 'fact finder's assessment of the truth'" [citation omitted]). Accordingly, consistent "with the trend of increased discovery in criminal cases," Sliech-Brodeur, supra at 325, we interpret rule 14 (b) (2) (B) (iii) to impose on a defendant an independent duty to disclose his or her expert's report to the prosecution "after the defendant expresses the clear intent to raise as an issue his or her mental condition," and where "the judge is satisfied that (1) the defendant intends to testify, or (2) the defendant intends to offer expert testimony based in whole or in part on statements made by the defendant as to his or her mental condition at the relevant time." Mass. R. Crim. P. 14 (b) (2) (B) (iii).[14]

---

[14] We disagree with the defendant that the required disclosure of his mental health expert's report to the prosecution implicates his right against self-incrimination. As Chief Justice Gants (then Associate Justice) observed in his dissent in Sliech-Brodeur, 457 Mass. at 340, that right "does not apply to a defendant's statements to the psychiatrist [or psychologist] retained by his attorney because these statements were not compelled by the Commonwealth or the court; the defendant voluntarily chose to speak to his defense expert." "Nevertheless," the dissent explained, "disclosure to the prosecution of the defense expert's reports and statements must still wait until the defendant decides whether the expert will testify at trial based in whole or in part on the defendant's statements to the expert, because, until that decision is made,

Here, the judge ordered the defendant to turn over his expert's report to the prosecution based on his conclusion that "there has been a commitment by the defense to the diminished capacity" of the defendant.  This was not in error.  By this stage of the proceedings the defendant had expressed the "clear intent to raise as an issue his . . . mental condition," Mass. R. Crim. P. 14 (b) (2) (B) (iii), having explained before jury empanelment that he was "seeking a murder two conviction . . . based on diminished capacity," and that the defense would include "psychiatric testimony."  And as discussed, over a month before jury selection the defendant had filed his notice of expert witness, informing the prosecution (and the judge) that the defense would call Joss to testify "that at the time of the offenses [the defendant] was undergoing an unusual pattern of indiscriminate substance abuse" and "was experiencing the effects of a drug induced psychosis" that led to the killing of his mother and grandmother.  Joss then appeared on the list of potential witnesses in the case.  On these bases, the judge reasonably concluded that either (1) "the defendant intend[ed] to testify," or, more likely, (2) "the defendant intend[ed] to

---

the defendant's statements to a defense expert retained by his attorney are protected by the attorney-client privilege. Reports and statements arising from such communications, while not within the compass of a defendant's privilege against self-incrimination, are protected by the work product doctrine" (emphasis in original).  Id. at 341.

offer expert testimony based in whole or in part on statements made by the defendant as to his . . . mental condition at the relevant time."  Id.[15]

3.  Lack of criminal responsibility and ineffective assistance of counsel.  The defendant also seeks reversal of his convictions on the grounds that he lacked criminal responsibility for the murders; relatedly, he argues that trial counsel's failure to present this argument to the jury constitutes ineffective assistance of counsel.  In support of these positions the defendant relies exclusively on Joss's report, which he contends "contains clear evidence that [the defendant] lacked criminal responsibility" for the murders.

We reject both arguments for essentially the same reason: having reviewed Joss's report, which is impounded, we simply find no support for the defendant's position that he lacked criminal responsibility.  To the contrary, Joss concluded that

---

[15] Rule 14 (b) (2) (B) (iii) vests a trial judge with discretion when making this determination, given that it conditions disclosure of the defense expert's report on the "the judge [being] satisfied" that the defense will include either the defendant's testimony or an expert's testimony based on the defendant's statements (emphasis added).  Such discretion is necessary in cases such as this, where despite being ordered to do so twice -- first, pursuant to Mass. R. Crim. P. 14 (b) (2) (A) (iii), in the defendant's notice of a mental health defense, and again by the court order granting the prosecution's motion for reciprocal discovery regarding the defense expert -- the defense apparently failed to clarify before trial whether Joss would be relying on the defendant's statements regarding his mental condition.

the defendant did <u>not</u> have a mental disease or defect -- an essential element of a defense based on lack of criminal responsibility. See <u>Commonwealth</u> v. <u>McHoul</u>, 352 Mass. 544, 546-547 (1967) ("A person is not responsible for criminal conduct if at the time of such conduct <u>as a result of mental disease or defect</u> he lacks substantial capacity either to appreciate the criminality . . . of his conduct or to conform his conduct to the requirements of the law" [emphasis added]). Rather, Joss concluded that the "source" of the defendant's impaired mental state at the time of the killings "was his ingestion of multiple drugs in an abusive way in the days and hours leading up to the [killings]." This weighs strongly against the viability of a defense of lack of criminal responsibility, because the "[v]oluntary consumption of alcohol or drugs . . . do[es] not qualify as [a] 'mental disease[] or defect[]' in the <u>McHoul</u> formulation; as a result, a defendant whose lack of substantial capacity is due solely to one of these conditions, and not to any mental disease or defect, is criminally responsible" (citation omitted). <u>Commonwealth</u> v. <u>DiPadova</u>, 460 Mass. 424, 431 (2011).[16] Contrast <u>Commonwealth</u> v. <u>Mutina</u>, 366 Mass. 810,

---

[16] In light of Joss's conclusion that the defendant's drug consumption was the source of his impairment, it is immaterial that Joss erroneously relied on the definition of "mental illness" under 104 Code Mass. Regs. § 27.05(1), which relates to involuntary commitment.

811-817 (1975) (reversing conviction of murder in first degree where defendant presented "very strong evidence of his lack of criminal responsibility" consisting of, among other things, testimony of two psychiatric experts who concluded defendant's schizophrenia prevented him from conforming his conduct to law, and where prosecution failed to present "any affirmative evidence of the defendant's sanity").[17]

We similarly reject the defendant's contention that trial counsel was ineffective for failing to present a lack of criminal responsibility defense. "The defendant did not file a motion for a new trial and therefore rests his claim of ineffective assistance of counsel solely on the trial record. Such ineffective assistance of counsel claims are 'the weakest form of such a challenge' because they lack 'any explanation by trial counsel for his actions.'" Commonwealth v. Griffin, 475 Mass. 848, 857-858 (2016), quoting Commonwealth v. Peloquin, 437

---

[17] We also reject the defendant's suggestion that it was the prosecution's burden to demonstrate that the defendant was criminally responsible. Only where a defendant "asserts a defense of lack of criminal responsibility and there is evidence at trial that . . . would permit a reasonable finder of fact to have a reasonable doubt whether the defendant was criminally responsible" does the prosecution "bear[] the burden of proving beyond a reasonable doubt that the defendant was criminally responsible." Commonwealth v. Lawson, 475 Mass. 806, 811 (2016), quoting Commonwealth v. Keita, 429 Mass. 843, 849–850 (1999). As mentioned, the defense did not assert a lack of criminal responsibility defense here; to the contrary, just before opening statements, defense counsel reiterated that it was "not bringing forward a criminal responsibility defense" (emphasis added).

Mass. 204, 210 n.5 (2002). "Examining this claim under G. L. c. 278, § 33E, 'we review the trial record alone to determine whether a defense counsel's strategic or tactical decision questioned on appeal was manifestly unreasonable when made and, if so, whether the unreasonable decision resulted in a substantial likelihood of a miscarriage of justice.'" Griffin, supra at 858, quoting Commonwealth v. Brown, 462 Mass. 620, 629 (2012).

There were clear reasons for not pursuing a lack of criminal responsibility defense at trial. Compare Commonwealth v. LaCava, 438 Mass. 708, 714 (2003) (where counsel's expert opined defendant did not have mental disease or defect, not unreasonable for counsel to consider that opinion as "serious impediment" to insanity defense). In addition to Joss's conclusions, defense counsel also clarified before jury selection -- "[j]ust so the record is clear" -- that he had "talked to [the defendant] about [the defense's trial strategy] at length" and that "diminished capacity by reason of alcohol and drugs" was the defense that the defendant had "agreed to." The strategic focus on the defendant's substance abuse at the time of the killings was therefore not unreasonable and presents no likelihood of a miscarriage of justice.

4. Alleged substandard evidence collection. Last, the defendant contends that he was denied his constitutional right

to a "meaningful opportunity to present a complete defense," California v. Trombetta, 467 U.S. 479, 485 (1984), based on State police investigators' failure to collect evidence that may have been tied to the defendant's drug use -- specifically, a number of prescription pill bottles in his grandmother's apartment, and certain small plastic bags in his mother's apartment that were consistent with drug packaging. According to the defendant, this evidence "was potentially useful to support [his] defense that he possessed a diminished capacity to form the required intent for first degree murder due to his intoxication by drug use."

We reject the defendant's argument, primarily because the potentially exculpatory value of this evidence was not apparent at the time of the State police investigation. See Trombetta, 467 U.S. at 488-489 ("Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, . . . evidence must . . . possess an exculpatory value that was apparent before the evidence was destroyed [footnote omitted]"). The significance of the defendant's drug use did not come to light until nearly two years after the police's investigation in this case, when the defendant first raised his intoxication-based defense. There is also no

indication that the police intended to conceal such evidence here, given that photographs from their investigation display the prescription pill bottles and plastic bags. "While the prosecution remains obligated to disclose all exculpatory evidence in its possession, it is under no duty to gather evidence that may be potentially helpful to the defense." Commonwealth v. Lapage, 435 Mass. 480, 488 (2001).

Moreover, the jury were not, as the defendant suggests, entirely precluded from considering this evidence, as those photographs were submitted to the jury as exhibits. And as was the defendant's right under Commonwealth v. Bowden, 379 Mass. 472, 485-486 (1980), the defendant raised the issue of the adequacy of the police's evidence collection at trial, and the judge did not preclude the jury from considering those points when deciding whether reasonable doubt existed as to the defendant's guilt. See Commonwealth v. O'Brien, 432 Mass. 578, 590 (2000) ("Bowden simply holds that a judge may not remove the issue from the jury's consideration").

5. Review under G. L. c. 278, § 33E. We have carefully reviewed the entire record pursuant to our duty under G. L. c. 278, § 33E, and we discern no reason to order a new trial or to reduce the convictions of murder in the first degree to a lesser degree of guilt.

Judgments affirmed.